UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **JAMES OXENDINE** | **CASE NO. 2:24-CV-00740** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **BLOCKLINE BULLIES L L C ET AL** | **MAGISTRATE JUDGE LEBLANC** |

### MEMORANDUM RULING

Before the Court is a "Motion for Preliminary and Permanent Injunction" (Doc. 2) filed by Plaintiff, James Oxendine d/b/a Southwest Bully Kennels. In his Motion, Plaintiff moves for an order to enjoin Defendants, Blockline Bullies, LLC, and Steven Coker, form using and misappropriating the intellectual property of James Oxendine d/b/a Southeast Bully Kennels, including without limitation, Plaintiffs' marks, service marks and trademarks.

In addition to opposing Plaintiff's Motion for Preliminary and Permanent Injunction, Defendants, Steven Coker, in his individual capacity and as the Manager and sole Member of Blockline Bullies ("Blockline") filed the instant "Motion for Summary Judgment" (Doc. 18). Defendants move as follows: (1) to terminate and/or dissolve Plaintiff's trademark registration of "Block Bloodline" and dismiss Plaintiff's complaint with prejudice, at Plaintiff's cost, and (2) to rule that Defendant's use of the terms "Blockline Bullies" is protected under the "first use" doctrine and dismiss Plaintiff's complaint with prejudice at Plaintiff's costs.

## FACTUAL STATEMENT

On September 5, 2023, Plaintiff, James Oxendine, individually, applied for and was granted a trademark by the United States Trademark and Patent Office (the "USTPO") of the appearance of the words "Block Bloodline" without claim to any particular font style, size, or color. (the "Mark").[1] Plaintiff's Mark does not include any picture or image other than the standard text, and on its face contains the legal disclaimer that "No claim is made to the exclusive right to use the following apart from the Mark as shown: 'BLOODLINE'".[2] Plaintiff does not hold a patent protecting any breed or bloodline of any animal and the trademark he holds does not protect any attributes, characteristics, or likeness of any animal.[3]

Defendants are Steven Coker, individually, and Blockline Bullies, LLC, a limited liability company formed under the laws of Louisiana.[4] The terms "Block" and "bloodline" when used separately are generic terms.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

---

[1] See Plaintiff's exhibit A, Doc. 1-1, p.1.
[2] *Id.*
[3] *Id.*
[4] Defendant's exhibit X.

The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW AND ANALYSIS

Steven Coker and Christopher "Block" Delhommer, are dog breeders who breed American Bully dogs. The assert that they have been breeding and selling American Bullies as "Blockline Bullies" in the Gulf South geographical region since 2018. On September

30, 2022, Steven formed a limited liability company, Blockline Bullies, LLC,[5] using the same name that Steven and "Block" had been using for years.[6] Steven declared that he has never used the phrase "block bloodline" in commerce or in connection with any dog breeding or animal-related business.[7]

As noted above, Plaintiff obtained a trademark for "block bloodline," or the Mark.[8] The trademark granted contains a legal disclaimer that "No claim is made to the exclusive right to use the following apart from the mark as shown: 'BLOODLINE.'"[9] Plaintiff does not hold a patent that protects any breed or bloodline of any animal and the trademark he holds does not protect any attributes, characteristics, or likeness of any animal.[10]

In 2024, Steven received a cease-and-desist letter from Oxendine, who owns a Southeast Bully Kennels in North Carolina that sells dogs using that business name.

Title 15 U.S.C. § 1115(a) provides that "[a]ny registration issued ... of a mark registered on the principal register ... and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark...." Here, Plaintiff's registered Mark is *prima facie* evidence that he has the exclusive right to use "Block Bloodline" in connection with class 044, animal breeding services, as identified in the class description.[11] Plaintiff suggests that the Mark "Block Bloodline" is compound, and should be analyzed as such, whereas, Defendants suggest that "Block" should be

---

[5] Steven Coker is the sole Member (owner) of the LLC.
[6] Defendant's exhibit F, ¶¶ 1-3..
[7] *Id.*, ¶ 4.
[8] Doc. 1-1.
[9] *Id.*
[10] *Id.*
[11] Plaintiff's exhibit A, Doc. 1-1, Oxendine Trademark Reg. No. 7155100.

considered as a separate term or word to determine its genericness. The Court will consider the term "Block Bloodline" as compound as suggested in *United States Patent and Trademark Office v. Booking.com B.V.*, 591 U.S. 549, 140 S.Ct. 2298 (June 30, 2020). For a compound term, the distinctiveness inquiry trains on the term's meaning as a whole, not its parts in isolation. *Id.* at 556.

The Court has the authority to terminate the Plaintiff's Mark pursuant to 15 U.S.C. § 1119. A generic name—the name of a class of products or services—is not eligible for federal trademark registration. See *Booking.com B.V.*, 591 U.S. at 551.

> A trademark must be distinctive to be valid, and a distinctive mark is one capable of identifying the source of its user. See *Amazing Spaces*, 608 F.3d at 237. There are two types of distinctive marks. "A mark is inherently [sic] distinctive if its intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (cleaned up). A mark can also acquire distinctiveness "if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." Id. at 211, 120 S.Ct. 1339 (cleaned up).

*Appliance Liquidation Outlet L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 374-75 (5th Cir. 2024).

> Prime among the conditions for registration, the mark must be one "by which the goods of the applicant may be distinguished from the goods of others." § 1052; see § 1091(a) (supplemental register contains "marks capable of distinguishing ... goods or services"). Distinctiveness is often expressed on an increasing scale: Word marks "may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753 (1992).
>
> The more distinctive the mark, the more readily it qualifies for the principal register. The most distinctive marks—those that are "'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent)"—may be placed on the principal register because they are

"inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 210–211, 120 S.Ct. 1339 (2000). "Descriptive" terms, in contrast, are not eligible for the principal register based on their inherent qualities alone. *E.g.*, *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 718 F.2d 327, 331 (CA9 1983) ("Park 'N Fly" airport parking is descriptive), *rev'd on other grounds*, 469 U.S. 189, 105 S.Ct. 658, (1985). The Lanham Act, "liberaliz[ing] the common law," "extended protection to descriptive marks." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 171, 115 S.Ct. 1300, 131 (1995). But to be placed on the principal register, descriptive terms must achieve significance "in the minds of the public" as identifying the applicant's goods or services—a quality called "acquired distinctiveness" or "secondary meaning." *Wal-Mart Stores*, 529 U.S. at 211, 120 S.Ct. 1339 (internal quotation marks omitted); see § 1052(e), (f). Without secondary meaning, descriptive terms may be eligible only for the supplemental register. § 1091(a).

At the lowest end of the distinctiveness scale is "the generic name for the goods or services." §§ 1127, 1064(3), 1065(4). The name of the good itself (*e.g.*, "wine") is incapable of "distinguish[ing] [one producer's goods] from the goods of others" and is therefore ineligible for registration. § 1052; see § 1091(a). Indeed, generic terms are ordinarily ineligible for protection as trademarks at all. See Restatement (Third) of Unfair Competition § 15, p. 142 (1993); *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (CA2 1999) ("[E]veryone may use [generic terms] to refer to the goods they designate.").

*Booking,* 591 U.S. at 553-54.

*Dissolution of the Mark*

Here, Defendant attempts to demonstrate the genericness of the Mark—"Block Bloodline."[12] The Court will consider "how [the term] is used with other words," "the products or services to which it is applied," and "the audience to which the relevant product or services is directed." *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 947 (5th Cir. 1990). Moreover, "[w]hat do the buyers

---

[12] Defendants note that Plaintiff appears to concede that he has no exclusive right to use the term "bloodline" outside of its appearance with the preceding word "block." Doc. 1-1.

understand by the word for whose use the parties are contending?" *Id.* (quoting *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921) (Hand, J.)).

Determining whether a mark is generic involves three steps: "(1) identify[ing] the class of product or service to which use of the mark is relevant; (2) identify[ing] the relevant purchasing public of the class of product or service; and (3) [determining whether] the primary significance of the mark to the relevant public is to identify the class of product or service to which the mark relates." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996).

Evidence of a public understanding of the primary significance of a mark can come from "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Id.* The burden of proof lies with the party seeking to establish the genericness, meaning they must prove the mark is generic by clear and convincing evidence. *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 600 (Fed. Cir. 2016).

Here, the class or product is animal breeding for Class 44.[13] To be sure, the Plaintiff contends that he has a specific bloodline of bullies that he breeds to sell to the public. To determine the relevant purchasing public of the class of product or service, the Court must determent whether to the "primary significance of the term in the minds of the consuming public is not the product but the producer," *Kellogg*, 305 U.S. at 118, 59 S.Ct. 109, considering the Mark in its entirety. *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents,* 252 U.S. 538, 545-46, 40 S.Ct. 414 (1920). However, "this does not preclude courts from considering the meaning of individual words in determining the meaning of

---

[13] Plaintiff's exhibit A, Doc. 1-2.

the entire mark." *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 253 (4th Cir. 2001). As such, the Court considers the two elements "block" and "bloodline" before considering them in combination.

Defendants challenge Plaintiff's attempt to create "distinctiveness" by his assertion that he is not aware of any other usage for the element "BLOCK" in connection with its product.[14] Plaintiff argues that "the record is absent of any proof that Plaintiff produces bullies made of "blocks" (i.e. toy lego-styled bullies)" and "any proof" that "block" taken separately is generic to class 044—animal breeding services of bully dogs."[15] Plaintiff points to Doc. 15-6 to support his argument that some of the top bloodlines of bully dogs do not contain the name "block". This exhibit is an article of 10 top breeders of American Bullies, none of which contain the name "block".

Defendants assert that dog breeders use the generic word "block" repeatedly in connection with their services. Defendant submits a table of dog kennels and service providers who have an internet presence and who all use the word "block" in some form in connection with their businesses.[16] The table, which is not an exhaustive list, includes the names of forty (40) dog kennels that use the word "block" to describe their kennel.

In *El Chico, Inc. v. El Chico Café*, 214 D.2d 721 (5th Cir. 1954), there were 27 third-party registrations of the mark "Chico," "El Chico" and other similar names; the court ultimately concluded that the use of the words "El Chico" was a 'weak' trade name due to their wide usage.

---

[14] See Doc. 2-1, p. 9.
[15] Opposition, p. 13, Doc. 23.
[16] Defendants' exhibit C; Defendants note that this is not an exhaustive list.

Plaintiff asserts in his Memorandum in Support of the Motion for Preliminary Injunction that "as to competitor usage, BLOCK BLOODLINE is not aware of any other usage of the element "BLOCK" in connection with Relevant Products and Services, or similar product and services."[17] He then argues that the lack of usage by competitors to describe their products and services further demonstrates the distinctiveness of the BLOCK BLOODLINE mark."[18] However, in response to Plaintiff's Motion for Preliminary Injunction, Defendants submitted a list of 22 Bully breeding programs/kennels that use the term "block" in Bully dog kennel names.[19]

Defendants point out that the word "block" has 40 different meanings, "bloodline" is a generic term,[20] and is used throughout English parlance in a wide variety of context, such as "H&R Block," "Three Block War," and "New Kid on the Block."

Next, Defendants submit evidence that the word "block" or "block headed" is a generic term used to describe various dog breeds in general, including Pit Bulls, American Bulldogs, Boxers, Boston Terriers, Rottweilers, English Bulldogs, and particularly common among breeders of the American Bully breed. Defendant provides an excerpt from the "HUGABULL Advocacy & Rescue Society," which states the following:

> Bully breed, Blockhead ... or 'Derp'?
>
> "Pit Bull" and "staffy" seem to have been co-opted by people looking for an umbrella term for a certain group of dogs. Unfortunately, both have their limitations; those terms stem from names for specific dog breeds but have become so widely used they are nearly meaningless.

---

[17] Doc. 2-1, p 9.
[18] *Id.*
[19] Doc. 10-3.
[20] See Doc. 1-1, which states the Plaintiff has not claim to the exclusive right to use the appearance of "bloodline" outside of its appearance with the preceding generic work "block".

> This invites confusion, especially when lawmakers try to use those same terms to restrict dog types and mixes.
>
> When we do need to talk about a category of dogs, more and more advocates are gravitating towards "bully", "bully breed" or "blockhead" . . . .
>
> *These terms are intentionally loose because they encapsulate a group of dogs* that have branched off from common ancestry: the Molosser breeds . . . .
>
> No terminology will please everyone, but "bully breed" or "blockhead seems to do the best job at being a true umbrella term for dogs that share a common ancestry and certain physical characteristics. Keeping in mind that every dog is an individual, if you are pressed to describe a dog type—or to simply describe to a stranger what kind of dog you have—this might be better than the alternatives.[21]

Defendants argue that the Mark should have never been granted because it is too generic. In response, Plaintiff through counsel, suggests that it is premature to rule on this dispositive motion because discovery has not yet been conducted. Plaintiff relies on rules of the Trademark Trial and Appeal Boards, which do not apply to this Court. Furthermore, the Plaintiff is in possession of much of the evidence that is the basis of his Complaint, and it was incumbent on Plaintiff to produce any evidence to dispute the summary evidence submitted by Defendants.

The purpose of the Lanham Act is "to prevent commercial monopolization of language that otherwise belongs in the public domain." *S.F. Arts & Athletics, Ind. V. U.S. Olympic Comm.*, 483 U.S. 522, 573, 107 S.Ct. 2971 (1987) (Brennan, J., dissenting).

---

[21] https://www.hugabull.com/bully-breed-or-block-head. (emphasis added).

It appears to this Court by the evidence submitted by Defendants, that the word "block" is readily used in the breeding of dogs related or similar to American Bully breeding program. However, as noted above, for a compound term the distinctiveness inquiry trains on the term's meaning as a whole. *Booking, supra.* Eligibility for registration turns on the Mark's capacity to "distinguish[h]" goods "in commerce." 15 U.S.C.A. § 1052.

Plaintiff "must show that the primary significance of the term ["Block Bloodline"] in the minds of the consuming public is not the product but the producer," *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 59 S.Ct. 109 (1938), where a generic mark "neither signifies the source of goods nor distinguishes the particular product from other products on the market." *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535 (4th Cir. 2004).

Plaintiff must submit persuasive evidence that the consuming public understands "Block Bloodline" to be a specific brand, not a generic name for animal breeding services or product. Plaintiff submitted no consumer survey, or testimony, trade journals or other publications as to the public's understanding of "Block Bloodline."

Even considering the Mark in its entirety, and noting that the word "bloodline," which Plaintiff has no claim to the exclusive right to use, the Court finds that Defendant has met its burden of genericness as to "block bloodline."

*Distinctiveness versus descriptive*

Alternatively, if the Court did find the Mark is descriptive, Defendant maintains that the Mark does not have the necessary distinctiveness of "secondary meaning" required for the registration of trademarks with the United States Patent and Trademark Office--the

Principal Register and the Supplemental Register.[22] Thus, Defendant asks the Court to rule that the Mark does not belong to the category of descriptive terms that can be registered in the Primary Register, and grant Defendant summary judgment, terminate Plaintiff's Mark and dismiss the Complaint.

The Lanham Act provides two types of registration of the trademarks with the USPO—the Principal Register and the Supplemental Register. The Supplemental Register permits registry of a mark considered to be "descriptive" where the mark as used in interstate commerce, can potentially identify goods and/or services with a particular source, and/or has not yet acquired distinctiveness at the time of registration.

Defendants argue that if the Court finds that the Mark is descriptive, it has not acquired the "secondary meaning" in the minds of consumers necessary to support its maintenance in the USPTO Primary Registry. In other words, the combination of the two generic terms "block bloodline" do not convey to consumers a source-identifying characteristic. Defendants posit that Plaintiff has failed to present evidence that shows that the Mark has achieved "acquired distinctiveness" or "secondary meaning" in the minds of consumers.

Plaintiff argues that the Mark—Block Bloodline is suggestive of class 044 animal breeding services. Plaintiff suggests that one would have to close his eyes to imagine a block to picture a "Block" shaped bully.

---

[22] The Supplemental Register can afford a place to register a mark that may not be eligible for registration on the Principal Register, particularly when a mark has not acquired the necessary distinctiveness required for the Principal Register. The Supplemental register permits a mark, namely those marks considered to be "descriptive," to be registered in instances where the mark is in use in interstate commerce, can potentially identify goods and/or services with a particular source, and/or has not yet acquired distinctiveness at the time of registration.

The distinctiveness of a trademark is categorized by courts using a scale. The distinctiveness scale commonly used by court and pointed to by both Plaintiff and Defendants is as follows: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. As pointed out above, "generic" terms do not qualify for registration in the Principal Registry. "Descriptive" terms may be valid or invalid. To be placed on the principal register, "descriptive" terms must achieve significance "in the minds of the public" as identifying the applicant's goods or services—a quality called "acquired distinctiveness" or "secondary meaning." *Booking, supra.*

Defendants maintain that the Mark is not descriptive, but generic making it invalid and ineligible for federal trademark registration. In other words, , the Mark does not achieve significance "in the minds of the public," or if it lacks a "secondary meaning", it is unregistrable.

To determine whether "descriptive" terms have acquired secondary meaning, courts consider the following seven factors: (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark. *Viacom Int'l v IJR Cap. Invs.*, 891 F.3d 178, 190 (5th Cir. 2018).

As to the first factor, Plaintiff states in the opposition brief that he has used the mark (unregistered) since 2012—or 12 years. Defendants contend that Plaintiff's use of the Mark appears to vary, including plural usage, and as part of a larger name. Defendants point out that the exhibits relied upon by Plaintiff show only five animals whose registrations bear

both words "block" and "bloodline", and those entries are not dated. The Court notes that there is no evidence as to how Plaintiff used the unregistered Mark, and to what extent.

As to volume of sales, Defendant suggests that Plaintiff has failed to provide any evidence to establish his volume of sales. In response, Plaintiff complains that no discovery has been taken place, therefore there is a genuine issue of material fact.

The Court notes that Plaintiff, the person selling the dogs, should have this information in his possession and finds Plaintiff's argument without merit. As to the exhibits Plaintiffs rely upon, Defendants point out that the sales are limited, and some of those sales appear to be attributable to someone other than Plaintiff, James Oxendine.[23] Additionally, Defendants remark that Plaintiff's claim to international fame exists as to the sale of only two (2) animals sold in Canada.

Defendants argue that Plaintiff's advertising appears to be limited to its website and social media, where numerous other dog breeding business use similar names identical to the Mark. Plaintiff remarks that his Facebook page indicates he has over 100,000 followers and likes to show that he has a large following. Defendants remark that there is no evidence of advertising in magazines or newspapers.

Defendants assert that Plaintiff has no consumer-survey evidence to offer. Plaintiff argues again that he has not had a chance to make Rule 26 initial discovery disclosures. Defendants inform the Court that Plaintiff has not propounded any discovery, and or, this evidence would be in their possession. Thus, Plaintiff's argument is again without merit.

---

[23] Erwin Oxendine.

Defendants assert that Plaintiff has offered no consumer testimony. Defendants remark that on July 13, 2024, at the 1st Annual National Bully Awards in Atlanta, Georgia, where breeders were recognized based on online voting, Defendant appeared fifth on the list of breeders nominated in the category of "American Bully Breeders" whereas, neither James Oxendine, nor his business, was nominated or mentioned at all.[24] Plaintiff offers no evidence as to consumer testimony.

Finally, Defendant asserts that he had no intentions at all of copying Plaintiff's Mark and there is not one scintilla of evidence that suggests that even one customer was confused by Defendant's business name, such that the customer mistakenly purchased a pet from Blockline Bullies, LLC, believing that they were actually purchasing an animal from Southeast Bully Kennels. Defendant declares that he had never heard of Plaintiff or the Mark until he received the cease-and-desist letter in 2024. Plaintiff offers no evidence to the contrary.

Next, Defendants contend there is no evidence that he copied Plaintiff's Mark, noting that Blockline Bullies is a business name for a dog breeder in Louisiana, whereas, Block Bloodline is used by Southeast Bully Kennels, in North Carolina, as a "tagline." Thus, Defendants maintain that there is no confusion between the two uses.

In summation, Defendant argues that the "Block Bloodline" Mark does not convey to consumers a source-identifying characteristic. Specifically, Defendants contends that Plaintiff has failed to present any evidence to show that the Mark has achieved "acquired

---

[24] Defendant's exhibit E, screenshot of https://www.nationalbullyawards.com/

distinctiveness" or "secondary meaning" in the minds of consumers. Defendants contend that he has presented evidence that the terms "block bloodline" denotes a category of dogs commonly used by those in the dog breeding community. The Court agrees and finds that taken as a whole, the Mark does not signify to consumers a class of goods or services, nor have Plaintiffs submitted evidence of a secondary meaning. As such the Mark does not belong to the category of descriptive terms that can be registered in the Primary Register.

*Prior use doctrine*

Defendants argue that they have priority usage over "Blockline Bullies" because of their prior usage in the Gulf South region. Moreover, Defendants contend that Plaintiff cannot prove first use in the Gulf South Geographical Area. The "prior use doctrine" recognized by the Fifth Circuit grants superior rights to the first party to use a designation or mark in commerce within a specific geographic area. *Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839 (5th Cir. 1990).

Plaintiff submits a 2014 Instagram account bearing mark "Block Bloodline"[25] to show that he had a presence in the Gulf South region. However, this one Instagram screenshot does not reflect any specific geographic area. Defendants submit media screenshots, one of which is in Biloxi, Mississippi, as well as an Affidavit that he and Chris Delhommer were using the phrase "Blockline Bullies" as of February, 2018, in the Gulf South region.[26] Plaintiff has failed to submit any conclusive evidence of sales in the Gulf

---

[25] Doc. 15-5.
[26] Docs. 19-4, 19-6.

South in which "Block Bloodline" was used. Here, the Court finds that Plaintiff has failed to show that Plaintiff has prior use of the phrase.

## CONCLUSION

The Court agrees with Defendants that Plaintiff has failed to produce sufficient evidence that "Block Bloodline," if descriptive, has attained "acquired distinctiveness" or "secondary meaning" "in the minds of the public." Furthermore, Plaintiff has failed to establish customer confusion and/or any damage, as a result thereof.

For the reasons explained herein, the Court will grant the Motion for Summary Judgment (Doc. 18) filed by Defendants, Steven Coker, in his individual capacity and as the Manager and sole Member of Blockline Bullies, terminates Plaintiff's trademark—"Block Bloodline," and will dismiss this case with prejudice.

Also, because the Court is ruling in favor of Defendants, and for the reasons explained herein, the Court will also deny Plaintiff's Motion for Preliminary and Permanent Injunction.

**THUS DONE AND SIGNED** in Chambers on this 9th day of January, 2025.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**